USCA1 Opinion

 

 For the First Circuit ____________________ No. 96-2326 JAMES A. STEINKE, Plaintiff, Appellant, v. SUNGARD FINANCIAL SYSTEMS, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ____________________ Before Stahl, Circuit Judge, Lynch, Circuit Judge, and O'Toole,* U.S. District Judge. ____________________ Margaret S. Garvey , with whom  Wm. David Byassee ,  Freeborn & Peters , David C. Casey, Thomas A. Bockhorst, and Peckham, Lobel, Casey, Prince & Tye, were on brief for appellant. Mark  Blondman, with whom Scott  F.  Cooper, Blank  Rome  Comisky  & McCauley, and Testa,  Hurwitz  &  Thibeault,  LLP, were on brief for appellee. ____________________ August 6, 1997 ____________________ _____________________ *Of the District of Massachusetts, sitting by designation. STAHL, Circuit Judge. Plaintiff-appellant James A. Steinke appeals the district court's grant of summary judgment in favor of defendant-appellee SunGard Financial Systems, Inc. ("SFS") on his breach of contract and promissory estoppel claims. We affirm. Background We state the facts in the light most favorable to the party opposing summary judgment. See Hoeppner v. Crotched Mountain Rehabilitation Ctr., 31 F.3d 9, 14 (1st Cir. 1994). Steinke is a former SFS employee. SFS, a wholly- owned subsidiary of SunGard Data Systems, Inc., develops and sells computer software used for investment and financial purposes. In 1992, SFS decided to create a brokerage division called "Phase3" to develop software applications for the securities industry and specifically to compete with Security Industrial Software ("SIS"). SIS was a multi-service company whose primary business involved providing software and related services to self-clearing broker dealers. In 1992, Steinke was the President and Chief Executive Officer of SIS. In December 1992, Citicorp/Quotron, SIS's parent corporation, decided to sell SIS to a company called ADP.  1. In April 1993, Phase3 was renamed SunGard Brokerage Systems. For purposes of clarity, however, we substitute the name Phase3 for SunGard Brokerage Systems as the relevant entity throughout this opinion. -2- 2 When Dr. David Wismer, President and Chief Executive Officer of SFS, learned of ADP's acquisition of SIS, he thought Steinke might become available to head Phase3 and immediately began to recruit Steinke to come to Waltham, Massachusetts to lead Phase3. SFS's first efforts to recruit Steinke began in April or May 1992, when Wismer told Steinke that he understood SIS was well run and that he could use that type of management at Phase3. Late in 1992, Steinke attended a presentation that Wismer and James Mann, Chairman and Chief Executive Officer of SunGard Data Systems, made to Quotron. During this presentation, Wismer and Mann discussed with Quotron the possibility of SunGard Data Systems acquiring SIS. Mann also told Steinke during the meeting that if Steinke was to work for SFS, he would have one year to get to know the operations of Phase3 and two years after that to "conquer the ADP market." In early February 1993, Steinke met with Wismer at Stapleton International Airport in Denver to discuss possible employment at SFS. During this meeting, Wismer told Steinke that he wanted him to fill Phase3's need for professional management. Wismer informed Steinke that SFS expected him to take three years to acquire former SIS customers and to reach Phase3's $50 million annual revenue target. Later that month, Steinke met with Fraser Chambers, Executive Vice President of SFS's Eastern Region. Steinke inquired as to how SFS funded its divisions; Chambers responded -3- 3 that funding would be available if Steinke returned profits over a three-year period. Over the weekend of February 19-20, 1993, Steinke attended an SFS meeting in Naples, Florida. In Naples, Steinke met with a variety of SFS personnel, including Wismer, Chambers, and Mann, in order to finalize the terms of his employment with SFS. Wismer informed Steinke that he was in the process of putting together an offer letter for Steinke. The SFS executives also reiterated that SFS senior executives were rated by their performance over a three-year period. Wismer in particular indicated that Steinke would have three years to "show his mettle" at SFS by achieving the aggressive financial results SFS demanded of its Phase3 division. Wismer told Steinke that SFS might not make its numbers in 1992, but that the plan Wismer had developed was sound and Steinke had three years to "make his numbers." Wismer reassured Steinke that if he could make his numbers in that time frame, he would have a long and successful career at SFS. The following day, Mann confirmed that SFS operated on a three-year financial plan. On February 22, 1993, Wismer sent Steinke a letter constituting a formal offer of employment. The letter offered Steinke the position of President of SFS's Phase3 division at an annual salary of $195,000 plus bonuses and certain expenses. The letter stated that "[t]his offer is contingent upon your -4- 4 written acceptance of our [attached] Employee Agreement." The attached employment agreement contained a provision entitled "Termination," which provided: I understand that this agreement does not contain a guarantee of employment and that, at any time and for any reason, I may resign or SFS may terminate my employment. If I decide to resign, I will give at least two weeks' prior notice, and I will remain for the full notice period unless SunGard instructs me to leave earlier and pays the remaining salary I would have earned during the notice period. In return, if SunGard terminates my employment after six months without cause, I will receive at least two weeks' salary as severance pay. SFS previously had not informed Steinke that it required its employees to sign a form agreement before beginning employment. Prior to executing the relevant documents, Steinke telephoned Wismer and told him that he was concerned about several issues in the form agreement, including the termination provision. Specifically, Steinke expressed concern about the fact that temporary housing would only last until July 15, 1993 and indicated that he found SFS's offer of five expense-paid trips per year between his home in Colorado and SFS's offices in Massachusetts to be unacceptable. Wismer verbally agreed to modify the term of the temporary housing and to work with Steinke so that he could take some additional trips to Colorado. When Steinke asked Wismer whether or not he had to sign the form agreement, Wismer informed him it was required of all SFS employees. In his deposition, Steinke recounted that Wismer responded: "You'll be judged on your -5- 5 numbers and you've got three years to make them. [E]verybody signs it. It's not an issue." Steinke signed the Employee Agreement on February 26, 1993. Although the offer letter indicated "a most desirable start date" of March 15, 1993, after executing the Employee Agreement, Steinke informed Wismer that he could not start work before April 19, 1993 due to a non-compete agreement he had negotiated with SIS. Wismer responded that he wanted Steinke to start work on March 15, 1993. Steinke replied that he would be willing to work in some unofficial capacity and suggested that he be paid as a consultant. Wismer objected to this method of payment due to the accounting difficulties it apparently would occasion and remarked that "in the scheme of working together for the next five to ten years," Steinke should consider beginning work on March 15 with compensation for expenses only until he could officially start with SFS on April 19. Steinke agreed to this solution. When negotiations resulted in an acceptable arrangement, Steinke ceased considering alternative employment opportunities. On one occasion after Steinke began his employment with Phase3, Mann told him that he had three years to make his numbers under SFS's three-year plan. Also after starting his employment, Steinke learned that Phase3's expenses were running far beyond what they should be if he was to make a bottom line profit of $6.7  2. Steinke claims that he was reviewing at least two other employment offers when he accepted SFS's offer. 6 million for 1993. On July 14, 1993, Wismer and Steinke discussed SFS's financial situation and Wismer informed Steinke that the 1994 numbers would be even more critical. Wismer indicated that it was Steinke's job to put the Phase3 business plan together to achieve the goals, reinforcing the perception that Steinke had three years to make his numbers. On August 12, 1993, Wismer informed Steinke that his performance was "excellent." On October 15, 1993, however, SFS terminated Steinke's employment.  Steinke filed suit against SFS in Massachusetts Superior Court, alleging breach of contract, breach of implied contract, fraud in the inducement, negligent misrepresentation, and promissory estoppel. The gist of Steinke's claims was that SFS was obligated to compensate him for three years' worth of service based on its alleged oral representations to him and his subsequent reliance on these representations. SFS removed the case to federal district court on the basis of diversity of citizenship. See 28 U.S.C. S 1332(a)(1). On October 18, 1995, SFS filed a motion for summary judgment. The district court granted SFS's motion as to the breach of contract and breach of implied contract claims, but not as to the fraud in the inducement and negligent misrepresentation claims. The district court dismissed the promissory estoppel claim, and Steinke, after voluntarily dismissing the fraud and negligent misrepresentation claims 7 pursuant to Fed. R. Civ. P. 41(a)(2), now appeals the district court's rulings. Standard of Review We review the district court's grant of summary judgment de novo. See  Werme v.  Merrill, 84 F.3d 479, 482 (1st Cir. 1996). Summary judgment is appropriate when the record reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). A fact becomes material when it has the potential to affect the outcome of the suit. See  J. Geils Band Employee Benefit Plan v.  Smith Barney Shearson, Inc. , 76 F.3d 1245, 1250-51 (1st Cir.),  cert.  denied, 117 S. Ct. 81 (1996). We are not "wedded to the district court's reasoning. Rather, '[w]e are free, on appeal, to affirm [or reverse] a judgment on any independently sufficient ground.'" Garside v. Osco  Drug,  Inc., 895 F.2d 46, 49 (1st Cir. 1990) (quoting  Polyplastics, Inc. v.  Transconex, Inc. , 827 F.2d 859, 860- 61 (1st Cir. 1987)). Discussion On appeal, Steinke advances three arguments. First, he asserts that the district court erred in granting summary judgment on his claim of breach of an express and implied contract because issues of fact existed concerning the terms of his employment agreement with SFS, precluding the finding that this agreement constituted an unambiguous integrated contract. Second, Steinke maintains that the district court improperly granted summary 8 judgment on his contract claims because "disputed issues of fact existed regarding whether the written contract was modified to require employment for a reasonable term." Third, Steinke insists that the district court improperly dismissed his promissory estoppel claim. We address these arguments in turn. Before turning to the merits of Steinke's appeal, we note that the parties agree that, pursuant to a choice of law provision in the Employee Agreement, Pennsylvania law governs contract-based claims arising out of the Agreement. Because we see no compelling reason to do otherwise, we will honor the parties' choice of law on all counts upon which they agree. See James  L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1245 (1st Cir. 1997);  Borden v.  Paul Revere Life Ins. Co. , 935 F.2d 370, 375 (1st Cir. 1991). A. Integrated Contract The district court found that "the Employment Agreement and the offer letter constitute[d] a complete expression of the parties' agreement regarding the terms of Steinke's employment." Steinke asserts that the district court erred because he and SFS never executed an integrated employment contract. Specifically, Steinke contends:  The contract consisted of the oral representations made to [him] . . . when he was solicited by SFS to head up its new brokerage division prior to receipt of the offer letter; the negotiations with respect to the term of the contract, the starting date, the duration of his temporary housing allowance and the number 9 of trips between Massachusetts and Colorado prior to his relocation which were settled after the written documents were received; and the offer letter and form agreement. Because "[t]here was no single document or combination of documents which fully and completely expressed the parties' agreement with respect to the employment relationship," Steinke argues that he was entitled to introduce parol evidence to prove the intent of the parties.  It is well settled that Pennsylvania law presumes all employment to be at-will. See Darlington v. General  Elec., 504 A.2d 306, 309 (Pa. Super. Ct. 1986) (tracing recognition of employment at-will doctrine in Pennsylvania to  Henry v.  Pittsburgh &  Lake  Erie  R.R.  Co., 21 A. 157 (Pa. 1891)); see also Scott v. Extracorporeal, Inc. , 545 A.2d 334, 336 (Pa. 1988). Specifically, Pennsylvania law dictates that absent a statutory or contractual provision to the contrary, it is presumed that either party may end an employment relationship at any time, for any or no cause. See Murray v. Commercial  Union  Ins.  Co., 782 F.2d 432, 435 (3d Cir. 1986). An employee attempting to overcome the presumption of at- will employment in Pennsylvania must demonstrate "facts and circumstances establishing some tenure of employment."  Cummings v. Kelling  Nut  Co., 84 A.2d 323, 325 (Pa. 1951). Overcoming the presumption constitutes "an up-hill battle" in Pennsylvania. Schoch v.  First Fidelity Bancorporation , 912 F.2d 654, 661 (3d Cir. 1990). 10 In this case, no statutory or contractual provision conflicts with Pennsylvania's presumption of at-will employment. SFS's offer letter stated that "[t]his offer is contingent on your written acceptance of our Employee Agreement." The Employee Agreement provided no fixed term of employment. Instead, the Employee Agreement stated: "I understand that this agreement does not contain a guarantee of employment and that,  at any time and for any reason, I may resign or SunGard may terminate my employment." (emphasis added). The Employee Agreement indicated only that if Steinke completed six months of employment with SFS, then SFS would pay him "at least two weeks' salary as severance pay" if it terminated his employment without cause. "[W]here a contract purports to be a complete legal obligation without any doubt as to its object or extent, it is presumed to reflect the whole legal right of the parties." Lenzi v. Hahnemann  Univ., 664 A.2d 1375, 1379 (Pa. Super. Ct. 1995);  see  Fountain Hill Millwork Bldg. Supply Co. v. Belzel, 587 A.2d 757, 760 (Pa. Super. Ct. 1991); Levy v. Leaseway Sys. Inc., 154 A.2d 314, 316 (Pa. Super. Ct. 1959).  Despite the clear language of both the Employee Agreement and Pennsylvania law, Steinke argues that the Agreement's object and extent remain in doubt, and points to parol evidence concerning representations of a fixed three-year term of employment that various SFS officials made to him prior to the execution of the Employment Agreement. Steinke places particular emphasis on the fact that SFS, in response in part to his concerns about the 11 termination provision in the Employment Agreement, indicated that "everybody signs it. It's not an issue." "Whether a writing is an integrated agreement, and if so, whether the agreement is completely or partially integrated are questions to be decided by the court prior to application of the parol evidence rule." Greenberg v.  Tomlin, 816 F. Supp. 1039, 1053 (E.D. Pa. 1993);  see  Hershey Foods Corp. v.  Ralph Chapek, Inc. , 828 F.2d 989, 995 (3d Cir. 1987). In determining whether an agreement is integrated, a court must compare both the alleged oral and written agreements and must determine whether "'the parties, situated as were the ones to the contract, would naturally and normally include the one in the other if it were made.'" Mellon Bank Corp. v.  First Union Real Estate Equity & Mortgage Invs. , 951 F.2d 1399, 1405 (3d Cir. 1991) (quoting  Gianni v.  R. Russel & Co. , 16 A. 791, 792 (Pa. 1924)); see Crompton-Richmond Co.--Factors v. Smith, 253 F. Supp. 980, 983 (E.D. Pa. 1966), aff'd, 392 F.2d 577 (3d Cir. 1967) (per curiam). If the alleged oral and written agreements "'relate to the same subject matter and are so interrelated that both would be executed at the same time and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing.'" Ralph  Chapek, 828 F.2d at 995 (quoting Gianni, 126 A. at 792). In such case, "'parol evidence to vary, modify or supersede the written contract is inadmissible in evidence.'" HCB Contractors v.  Liberty Place Hotel 12 Ass'n, 652 A.2d 1278, 1279 (Pa. 1995) (quoting  Nicolella v.  Palmer, 248 A.2d 20, 22 (Pa. 1968)). Having compared the alleged oral agreement and the written agreement in this case, we believe that Steinke and SFS would "naturally and normally" have included the alleged oral agreement in the written agreement had they actually made an agreement establishing three years as Steinke's term of employment. A provision dictating such a lengthy term of employment would be integral to an agreement providing an offer of employment and dictating the terms of such employment, including a specific termination provision. Moreover, Steinke specifically inquired about the termination provision and, after SFS informed him that all employees were required to sign the Employee Agreement as a condition of employment with SFS, he signed the Agreement without protest. Furthermore, the alleged oral agreement and the written  3. We believe the fact that Steinke signed the agreement after inquiring about its terms is particularly telling in this situation. Over a period of approximately twenty years, Steinke had worked for many large corporations involved in finance and high technology, including Merrill Lynch, Shearson Lehman Brothers, Kemper Securities, and Colgate Palmolive. Steinke negotiated and signed employment agreements with at least three of these corporations. Steinke's considerable experience in the field casts doubt upon his assertion that he did not expect to be bound by the termination provision. See, e.g.,  M/S Bremen v.  Zapata Off-Shore Co. , 407 U.S. 1, 11 (1972) (upholding written contractual provision in part because it was "made in an arm's-length negotiation by experienced and sophisticated businessmen"); Beckman v. Vassall-Dillworth Lincoln-Mercury, Inc. , 468 A.2d 784, 788 (Pa. Super. Ct. 1983) (rejecting argument that appellant did not intend "no-agency" clause to be included in his contract, reasoning in part that appellant "was an experienced businessman, equipped to understand the meaning of the terms of the agreement he 13 agreement (particularly the termination provision in the Employee Agreement) both addressed the duration of Steinke's employment with SFS. We therefore find that the Employee Agreement covered the scope of, and thus superseded, the alleged oral agreement. See Mellon Bank , 951 F.2d at 1406-08;  Ralph Chapek , 828 F.2d at 996-98; United Ref. Co. v. Jenkins, 189 A.2d 574, 579 (Pa. 1963); Gianni, 176 A. at 792;  Beckman v.  Vassall-Dillworth Lincoln-Mercury, Inc. , 468 A.2d 784, 788 (Pa. Super. Ct. 1983). "These cases show that under Pennsylvania law, a written contract which gives one party an unconditional right precludes the other party from using parol evidence to establish a condition on the exercise of the unlimited right the written text contains." Mellon  Bank, 961 F.2d at 1407. We thus affirm the trial court's finding that the offer letter and the Employment  signed").  4. Relying only on Moyer v. Heilveil, 49 A.2d 514, 515 (Pa. Super. Ct. 1946), Steinke quotes the Pennsylvania Supreme Court as ruling that "[a] contract may be partly oral and partly in writing and the written agreement does not supersede the oral contract unless it is complete in itself, embodying all the terms orally agreed upon." Id. The Moyer court reached this conclusion only after it determined that the writing in question was silent concerning the terms of employment; it reasoned "[i]t therefore was proper for plaintiff to prove a prior separate oral agreement not inconsistent with the writing and unaffected by it, establishing the actual intention of the parties." Id. (emphasis added). In the context of Steinke's appeal, Moyer thus dictates that Steinke may not have the opportunity to prove a separate oral agreement because the Employee Agreement contained a termination provision which specifically detailed the "terms of employment."  14 Agreement constituted an integrated agreement. Consequently, we hold that the district court did not err in applying the parol evidence rule to bar evidence of alleged oral terms. See HCB Contractors, 652 A.2d at 1280; International  Milling  Co. v. Hachmeister, Inc., 110 A.2d 186, 191 (Pa. 1955).  5. The fact that the offer letter and the Employment Agreement did not constitute one single document does not affect this ruling. An integrated agreement may take the form of two documents,  see  Kroblin Refrigerated Xpress, Inc. v.  Pitterich, 805 F.2d 96, 107 (3d Cir. 1986) ("It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties.");  see  also  Zaidan v.  Borg-Warner Corp. , 341 F.2d 391, 392 (3d Cir. 1965);  United States v.  Goldberg, 136 F. Supp. 34, 37 n.5 (E.D. Pa. 1955), provided it "appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement,"  Fountain Hill , 587 A.2d at 760. Moreover, "[w]hile the effect of an integration clause is to make the parol evidence rule clearly applicable, it is not required." Mellon  Bank, 951 F.2d at 1406 n.6 (internal citations omitted); see Ralph Chapek, 828 F.2d at 998. Thus, Steinke's argument that neither the offer letter nor the Employment Agreement contained an integration clause, and, thus, that there is no integrated contract, is unavailing. 6. Steinke's reliance on  McEvoy Travel Bureau, Inc. v.  Norton Co., 563 N.E.2d 188, 191-95 (Mass. 1990), is unpersuasive. As noted previously, the law of Pennsylvania controls these issues. McEvoy Travel , furthermore, is distinguishable on its facts. In McEvoy  Travel, the appellant signed a contract containing a sixty-day termination clause. When the appellant questioned the clause, the appellee informed him that the clause was "inoperative" and "meaningless." Id. at 191. The court held that the written contract was not an integrated agreement, reasoning as follows:  When parties . . . sign a document and include in it a provision as to termination by notice, at the same time expressly stating that the provision is a mere "face saving device" never to be effective, they have not adopted that 15 Apparently determined to circumvent the parol evidence rule, Steinke argues that the termination provision contained in the Employee Agreement is ambiguous. Specifically, Steinke maintains: If the contract was for "at will" employment, it would be inconsistent with the provision of the offer letter that provides Steinke temporary housing "until the earlier of July 15, 1993 or your move into your permanent residence." It would negate the provision that SFS would provide storage of Steinke's household goods "until the earlier of September 15, 1993 or your move into your permanent residence." . . . It is also at odds with the fact that Steinke was agreeing to a covenant not to compete for twelve months after his termination for any reason. A finding of ambiguity in the termination provision, according to Steinke, necessarily would entitle him to submit to a jury evidence concerning his alleged three-year contract with SFS.  document as a "complete and accurate integration" of their agreement. Instead they have [in Williston's words] issued it "in usual form but limited its terms by parole agreement."  Id. at 194 n.7 (quoting 3 Corbin  on  Contracts S 582, at 463 (1960)). In the instant case, SFS never told Steinke that either the Employee Agreement or the termination provision contained therein were "inoperative" or "meaningless." Wismer's remark that signing the Employee Agreement was not "an issue" does not equate with McEvoy  Travel's "never to be effective" language. Wismer, in fact, informed Steinke both that SFS required all of its employees to sign the Employee Agreement and that all SFS employees did so. The offer letter made this requirement clear with respect to Steinke, stating that "[t]his offer is contingent on your written acceptance of our Employee Agreement." 16 In Pennsylvania, "[o]nly if the terms used [in an agreement] are ambigious [sic] or if the contract is not fully integrated, should the trial judge allow the finder of fact to consider evidence that might vary or add to the contract's express terms." Griesmann v. Chemical  Leaman  Tank  Lines,  Inc., 776 F.2d 66, 72 (3d Cir. 1985);  see  Compass Tech., Inc. v.  Tseng Lab., Inc. , 71 F.3d 1125, 1131 (3d Cir. 1995) ("[I]f the[] [parties'] intent can be cleanly extracted from the clear and unambiguous words that the parties have used, it is . . . conventional wisdom that they are held to those words contained in the contract."); Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982) (holding that when words in written contract are clear and unambiguous, the intent is to be discovered only from the express language of the agreement). "In making the ambiguity determination, a court must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings." Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 101 (3d Cir. 1986). Having considered the integrated agreement's language, the meanings that Steinke suggests, and the extrinsic evidence he offered as evidence of these meanings, we believe that the terms of the integrated agreement in this case were unambiguous. As mentioned earlier, the Employee Agreement provided "this agreement does not contain a guarantee of employment and . . . at any time and for any reason I may resign or SunGard may terminate my employment. . . . [I]f SunGard terminates my 17 employment after six months without cause, I will receive at least two weeks' salary as severance pay." The existence of the words "at least" in the Employee Agreement in no way clouds or muddles the terms of the Agreement. It simply indicates that if SFS terminates an employee without cause after the employee has worked for six months, then SFS must pay the employee a minimum of two weeks' salary. At its discretion, SFS may agree to pay the employee more than two weeks' salary. In this case, Steinke failed to provide sufficient evidence of an oral agreement committing SFS to pay him more than two weeks' salary. See Schoch, 912 F.2d at 661 (finding that evidence appellant submitted to demonstrate oral contract of employment "lack[ed] the clarity and specificity that Pennsylvania courts require to overcome the presumption of at-will employment");  Kelling Nut , 84 A.2d at 324 (holding that statements made by employer regarding future possibilities were nothing more than "puffing"); Cashdollar v. Mercy  Hospital  of  Pittsburg, 595 A.2d 70, 76 (Pa. Super. Ct. 1991) (explaining that "an expectation of the prospective employee, however reasonable from his point of view, does not supply a meeting of the minds"). SFS simply exercised the discretion that the terms of the Employee Agreement afforded it in refusing to pay Steinke more than two-weeks salary as severance pay. We recognize that in Pennsylvania "[o]ne part of a contract cannot be interpreted so as to annul another part, and a contract must be construed, if possible, to give effect to all of 18 its terms." Meeting House Lane v.  Melso, 628 A.2d 854, 857-58 (Pa. Super. Ct. 1993); see Heidt v. Augenbaugh Coal Co., 176 A.2d 400, 401-02 (Pa. 1962); Giuliani  Constr.  Co. v. School  Dist.  of Philadelphia, 217 A.2d 793, 795 (Pa. Super. Ct. 1966). In this case, the fact that SFS could terminate Steinke's employment "at any time and for any reason" and pay him only two weeks', rather than three years' salary neither annuls nor renders inexplicable the provisions in the agreement that Steinke highlights. If SFS dismissed Steinke without cause, then pursuant to the agreement it still would be responsible for providing him temporary housing "until the earlier of July 15, 1993 or [his] . . . move into [his] . . . permanent residence;" it would continue to be obligated to store his household goods "until the earlier of September 15, 1993 or [his] . . . move into [his] . . . permanent residence;" and, Steinke would be precluded from competing with SFS for a period of twelve months after his termination. This construction of the agreement gives effect to all of the terms of the contract. Moreover, Pennsylvania law provides that contractual obligations contained in an employment contract may persist after the employment provided for in the contract is terminated. Cf. Insulation Corp. of Am. v.  Brobston, 667 A.2d 729, 733 (Pa. Super. Ct. 1995); Wainwright's  Travel  Serv.,  Inc. v. Schmolk, 500 A.2d 476, 479 (Pa. Super. Ct. 1985).  Given the terms of the integrated agreement between Steinke and SFS, considered in the context both of the arguments 19 and evidence Steinke advances and of Pennsylvania law governing the construction of contracts, we do not believe either that the agreement was ambiguous or that the district court's interpretation of the agreement improperly created an ambiguity in the agreement. See Amoco  Oil  Co. v. Snyder, 478 A.2d 795, 799 (Pa. 1984); McChesney, 444 A.2d at 663. The district court, therefore, did not err in refusing to admit parol evidence to determine the parties' intent. B. Modification Steinke next contends that even if the offer letter and Employee Agreement constituted an unambiguous integrated contract, a subsequent oral agreement with SFS modified the written agreement. Steinke maintains that on several occasions after he executed the Employee Agreement, SFS executives communicated to him that SFS would employ him for a fixed term of years. Steinke further contends that he supported this oral modification with separate consideration by working without any salary for one month. The district court found that the evidence Steinke offered to support his modification argument was "pretty thin." Consequently, the district court, after "[i]ndulging every nuance in Steinke's favor, [concluded that] no reasonable finder of fact could wring from these ruminations on SFS's corporate culture an affirmative offer to junk Steinke's existing at-will agreement in favor of a term contract." We agree. 20 In Pennsylvania, a party arguing that an oral agreement modified a prior written contract must prove the existence of the oral agreement "by evidence which is clear, precise[,] and convincing." Pellegrene v. Luther, 169 A.2d 298, 299 (Pa. 1961); see Gorwara v. AEL  Indus., 784 F. Supp. 239, 242 (E.D. Pa. 1992) (indicating that at-will presumption in Pennsylvania "can only be overcome by clear and specific evidence showing the parties' [sic] intended their contract to extend a certain period"). Generally, vague, broad, or aspirational statements are insufficient under Pennsylvania law to establish an oral contract modifying an at-will employment contract. See Green v. Oliver  Realty,  Inc., 526 A.2d 1192, 1202 (Pa. Super. Ct. 1987); Veno v. Meredith, 515 A.2d 571, 579 (Pa. Super. Ct. 1986); Darlington, 504 A.2d at 312. Specifically, promises of employment for "broad, unspecified durations do not overcome the [at will] presumption." Forman v. BRI Corp., 532 F. Supp. 49, 51 (E.D. Pa. 1982). In this case, we find the evidence that Steinke brings forth to support his claim of an oral modification of the written integrated agreement insufficiently clear and specific to reverse the district court's award of summary judgment to SFS on this issue.  Steinke asserts that when he informed Wismer that he could not begin work for SFS until April 19, rather than the preferred March 15 date specified in the offer letter, Wismer suggested that he work between these dates for expenses only given "the scheme of working together for the next five to ten years." 21 In March, during a discussion "over some drinks" in Steamboat Springs, Colorado, which focused primarily on the success of another SFS executive, Mann "made comments to the effect that, you know, you've got three years to make your numbers. You've got to beat out Simpson." During a dinner conversation on July 14, according to Steinke, Wismer worried aloud about his own prospects with SFS, "reinforcing that belief that you have three years to make your numbers. You can have a bad year, you can even have two bad years. But since it's a numbers company, three years and your employment would be at risk." Based on this evidence, in conjunction with the fact that he consented to work for SFS between March 15 and April 19 "for expenses only," Steinke concludes that he was "entitled to have a jury determine whether the post-contract representations, supported by the consideration of working without any salary for one month, modified the contract to incorporate the three year term." In Marsh v. Boyle, 530 A.2d 491, 494 (Pa. Super. Ct. 1987), the court found that an oral assurance of employment "for at least two years" lacked the requisite specificity to rebut the at- will presumption in Pennsylvania. In Darlington, the court rejected the appellant's argument that the parties had modified an at-will employment relationship given that the appellant was hired for a "long range project." See 504 A.2d at 32. The Darlington court reasoned that the "term long range project is, in and of 22 itself, too vague and unspecified to overcome the [at-will] presumption." Id.  Similarly, in McMahon v. Impact  Sys.,  Inc., 126 Lab. Cas. q 57,486, 1992 WL 201004, at 5 (E.D. Pa. 1992), the court did not find persuasive the plaintiff's argument that a conversation he had with his employer modified his written at-will employment contract. During the conversation in question, the employer asked the plaintiff how long he intended to be employed by the employer. The discussion then proceeded as follows: "I [the plaintiff] said I'd like to be employed for three years, then we can renegotiate where I can at least be suitable with the company, right? She [the employer] said that would be no problem. That was the agreement." Id. The court held that "this conversation, without more, [wa]s not sufficiently clear and definite to overcome the at-will presumption." Id.; see Extracorporeal, 545 A.2d at 337 (finding neither oral nor written assurances of permanent employment sufficiently definite or specific to rebut at-will presumption); Betts v.  Stroehmann Bros. , 512 A.2d 1280, 1281 (Pa Super. Ct. 1986) (finding oral understanding that employment "was to be long term" did not alter at-will presumption). In the instant case, the three conversations Steinke had with various SFS executives do not provide specific, definite evidence of both Steinke and SFS's intention to substitute an oral three-year term contract for Steinke's written at-will agreement. During these conversations, Wismer and Mann adverted to three, 23 five, and potentially even ten years in reference to Steinke's future employment with SFS. We believe these references amounted to nothing more than vague, aspirational statements. Accordingly, we find that they were insufficient to establish an oral contract modifying Steinke's written employment agreement. We note that Steinke argues that by working for SFS between March 15, 1993 and April 19, 1993 without salary, he supplied sufficient additional consideration to demonstrate the existence of an oral modification to his written at-will employment agreement. In Pennsylvania, separate or additional consideration may evince contract modification. See Green, 526 A.2d at 1200; Darlington, 504 A.2d at 314;  Nicolella, 248 A.2d at 23. "[A] court will find 'additional consideration' when an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform." Darlington, 504 A.2d at 315.  It does not appear to us that Steinke afforded SFS a substantial benefit other than the work he contracted to perform because the offer letter that Steinke accepted specifically delineated March 15 as his "most desirable start date." It was not until after he executed the Employee Agreement that Steinke informed SFS that he could not commence his employment until April 19 due to the restrictions of the non-compete agreement he had executed with SIS.  24 In addition, it seems unlikely that Steinke suffered any hardship by working from March 15 until April 19 without salary because it was his contractual duty to SIS that precluded him from commencing work as a salaried employee with SFS on March 15. The record does not reveal any other hardship that Steinke suffered during this period; for instance, he did not move his family to Massachusetts until after April 19. See id. (indicating that additional consideration may be sufficient when individual must move his family to commence a new employment position). We thus do not find that Steinke furnished SFS with the necessary separate or additional consideration to demonstrate an intent to modify his written at-will employment agreement. See id. at 315; Veno, 515 A.2d at 580; Betts, 512 A.2d at 1281.  Even if we were to find sufficient separate or additional consideration, this finding would not affect our analysis. In Pennsylvania, "if the parties specifically agreed that the employment would be at-will, even though additional consideration were present, . . . court[s are expected] to construe the contract according to the parties' stated intention and hold it to be at-will." Extracorporeal, 545 A.2d at 339. In this case, the parties agreed that Steinke's employment would be at will; we reiterate that the Employee Agreement stated: "I understand that this agreement does not contain a guarantee of employment and that, 25 at any time and for any reason, I may resign or SunGard may terminate my employment."  C. Promissory Estoppel Steinke finally argues that even if his at-will employment agreement was not modified, "under principles of promissory estoppel, a jury is entitled to determine that SFS is precluded from claiming that Steinke could be terminated at any time, without any recourse." Specifically, Steinke insists that he discontinued negotiations with other employers in reliance on the representations that his employment would be for three years; he sold his house and his wife quit her job to be able to move to Massachusetts. Steinke agreed to work  7. Steinke insists that "at a minimum," because he provided the consideration of working without salary from March 15 until April 19, he was "entitled to be paid for the period he performed services for SFS prior to his official start date of April 19, 1993 on the theory of implied contract." "A contract implied in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in light of the surrounding circumstances."  Elias v. Elias, 237 A.2d 215, 217 (Pa. 1968). In Pennsylvania, "[t]he law will not imply a different contract than that which the parties have expressly adopted." Hutchison v. Sunbeam  Coal Corp., 519 A.2d 385, 388 (Pa. 1986). Having determined that Steinke did not provide additional consideration to evidence a modified oral contract, we find no merit in Steinke's contention that he is entitled to be paid for the approximately four weeks during which he worked for expenses only. Steinke and SFS specifically agreed that in light of Steinke's non- compete agreement with SIS, he would not receive salary during this period. 8. Although the parties and the district court labeled Steinke's final claim "detrimental reliance," Steinke explains that it actually constitutes a "cause of action for promissory estoppel." We agree and thus use this designation in the discussion that follows. 26 for approximately four weeks without compensation based upon the further promises of SFS that in the overall relationship between the parties, the four weeks would be insignificant. The district court dismissed the promissory estoppel claim, reasoning that it was "simply a restatement of an element of the fraud claim and not a separate cause of action."  As a preliminary note, we believe that Pennsylvania rather than Massachusetts law governs the promissory estoppel claim in this case because promissory estoppel is a "contractually based cause of action" and thus should "fall[] within the purview of the choice of law clause." Shelley v. Trafalgar House Pub. Ltd. Co., 918 F. Supp. 515, 522 (D.P.R. 1996). We need not resolve this issue, however, because "the outcome is the same under the substantive law of either jurisdiction." Lambert v. Kysar, 983 F.2d 1110, 1114 (1st Cir. 1993);  see  Lucker Mfg. v.  Home Ins. Co. , 23 F.3d 808, 813 (3d Cir. 1994).  "[A]s a general rule, [in Pennsylvania] there is no common law cause of action against an employer for termination of an at-will employment relationship." Paul v. Lankenau Hosp., 569 A.2d 346, 348 (Pa. 1990); see Clay v. Advanced  Computer Applications,  Inc., 559 A.2d 917, 918 (Pa. 1989). Specifically, "the  doctrine  of  equitable  estoppel  is  not  an  exception  to  the employment  at-will  doctrine." Paul, 569 A.2d at 349 (emphasis added); see  Dugan v.  Bell Tel. of Pa. , 876 F. Supp. 713, 727 (W.D. Pa. 1994) (holding that employee could not assert claim of 27 promissory estoppel based on reliance on employer's alleged promise to find him permanent employment); Anderson v. Haverford College, 851 F. Supp. 179, 184 (E.D. Pa. 1994) (instructing that  Niehaus v. Delaware  Valley  Med.  Ctr., 631 A.2d 1314 (Pa. Super. Ct. 1993), rev'd, 649 A.2d 433 (Pa. 1994), was expressly limited to the facts of that case and did not revise the long-standing at-will presumption). Under Pennsylvania law, therefore, Steinke's promissory estoppel claim necessarily fails because Steinke was an at-will employee according to the written employment agreement executed on February 26, 1993. Under the doctrine of promissory estoppel in Massachusetts, "'[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" Veranda  Beach  Club  Ltd.  Partnership v. Western  Sur. Co., 936 F.2d 1364, 1380 (1st Cir. 1991) (quoting McAndrew v. School Comm., 480 N.E.2d 327, 332 (Mass. 1985)); see Chedd-Angier Prod. Co. v.  Omni Publications Int'l, Ltd. , 756 F.2d 930, (1st Cir. 1985) (explaining that Massachusetts has adopted Restatement (Second) of Contracts S 90); see also Carlson v. Arnot-Ogden Memorial Hosp., 918 F.2d 411, 416 (3d Cir. 1990) (indicating that in Pennsylvania, "[p]romissory estoppel allows the court to enforce a party's promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce 28 action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, and (3) injustice can only be avoided by enforcing the promise"); Murphy v. Burke, 311 A.2d 904, 908 (Pa. 1973) (indicating that Pennsylvania's promissory estoppel doctrine follows Restatement (Second) of Contracts S 90). In Massachusetts, "'[a]n element of promissory estoppel is that the party invoking it must have reasonably relied on the alleged promise to his detriment.'" Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1124 (1st Cir. 1995) (quoting Hall v. Horizon  House Microwave,  Inc., 506 N.E.2d 178, 184 (Mass. App. Ct. 1987) (emphasis added in Hall)); see Loranger  Constr.  Corp. v. E.  F. Hauserman Co. , 374 N.E.2d 306, 311 (Mass. App. Ct. 1978) (dictating that in the context of a promissory estoppel claim, "attention is to be focused upon the reasonableness of th[e] reliance"), aff'd, 384 N.E.2d 176 (Mass. 1978); see also Josephs v. Pizza Hut of Am. Inc., 733 F.Supp. 222, 226 (W.D. Pa. 1989), aff'd, 899 F.2d 1217 (3d Cir. 1990). Courts typically invoke the doctrine of promissory estoppel when the formal requirements of contract formation are absent and when enforcing the promise would serve the interests of justice. See Veranda  Beach, 936 F.2d at 1380; see also Carlson, 918 F.2d at 416. Steinke thus bears the burden of proving that he reasonably relied to his detriment on a promise that SFS made of a three-year term of employment. In this case, Steinke indicates that Wismer alluded to working together over "the next five to ten 29 years." Wismer's remark, even considered in the context of a few other statements indicating that SFS executives had three years to "make their numbers," did not constitute a promise upon which Steinke reasonably could have relied.  See  Coll, 50 F.3d at 1124-25 (1st Cir. 1995) (holding that employer's failure to "firm up" oral promise of long-term compensation rendered any reliance on an oral promise unreasonable);  Trifirio v.  New York Life Ins. Co. , 845 F.2d 30, 33-34 (1st Cir. 1988) (explaining, in a situation similar to the instant case, "a reasonable person investigates matters further; he receives assurances or clarification before relying"); Hall, 506 N.E.2d at 184 (declaring that "[i]nchoate negotiations are no better basis for reliance than for an action on the purported contract as such"); see also Burke, 311 A.2d at 400-01 (ruling that the evidence in the case did not support a finding that there was a promise upon which appellants relied to their detriment). We thus rule that the district court did not err in dismissing Steinke's promissory estoppel claim. Conclusion For the foregoing reasons, we affirm the district court's award of summary judgment to SFS both on Steinke's contractual claims and on his promissory estoppel claim. Affirmed. Costs to appellee. 30